2025 IL App (2d) 240318-U
No. 2-24-0318
Order filed May 5, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 14-CF-645 |
| WILLIAM J. ROSS, | ) ) ) | Honorable Tiffany E. Davis, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Schostok and Birkett concurred in the judgment.

**ORDER**

¶ 1   *Held*: The trial court did not err in granting the State's motion to dismiss defendant's postconviction petition at the second stage of the postconviction proceedings. Affirmed.

¶ 2   Defendant, William J. Ross, was convicted of first degree murder and found to have personally discharged a firearm that caused the death of the victim, Jacqueline Schaefer. 720 ILCS 5/9-1(a)(2) (West 2014); 730 ILCS 5/5-8-1(d)(iii) (West 2014). The trial court sentenced him to 49 years' imprisonment (plus 3 years' mandatory supervised release). On direct appeal, this court affirmed defendant's conviction and sentence. *People v. Ross*, 2018 IL App (2d) 161079.

Subsequently, defendant filed a postconviction petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)). The trial court summarily dismissed the petition, but, before defendant received notice of the dismissal, he moved for leave to withdraw his petition. The court granted the motion and withdrew its dismissal order. Defendant then filed an amended postconviction petition, the court set it for status, and the court summarily dismissed the amended petition more than 90 days after the petition was docketed. On appeal, this court vacated the dismissal and remanded the case for stage-two proceedings. *People v. Ross*, 2022 IL App (2d) 210068.

¶ 3 On remand, defendant filed a second amended postconviction petition and the trial court granted the State's motion to dismiss the petition. Defendant appeals, arguing that he made a substantial showing that (1) trial counsel was ineffective; (2) his rights under *Brady v. Maryland*, 373 U.S. 83 (1963), were violated; and (3) he is actually innocent. We affirm.

¶ 4 I. BACKGROUND

¶ 5 On August 13, 2014, the State charged defendant, then age 63, with one count of first degree murder (720 ILCS 5/9-1(a)(2) (West 2014)), alleging that, sometime in 2012, he shot Schaefer with a gun, thereby causing her death. Schaefer's body had been found on November 6, 2013, in her bedroom at defendant's residence at 518 North Country Club Drive in McHenry, in a state of advanced decomposition. Renee Bitton, defendant's friend, his former girlfriend, and the property's caretaker (defendant was away on a cross-country trip at this time), discovered the body after she gained access to the room. The door to the room was screwed shut. The screws were covered with caulk and duct tape, which were covered with trim and brown paint. No gun or bullets were recovered at the scene.

¶ 6 In June 2012, defendant had left McHenry and gone on a cross-country road trip, which continued until November 7, 2013, when he was arrested by local police in Las Vegas (on a failure-to-appear warrant for a traffic ticket).

¶ 7                                                     A. Trial

¶ 8 Trial commenced on July 19, 2016. The State's theory of the case was that, sometime after September 2011, defendant shot Schaefer two times (once in her head and once in her back), killing her, and sealed her body inside his house at 518 North Country Club Drive. As time passed, the body, which was in Schaefer's bedroom in two garbage bags covered with a tarp, began to decompose. It smelled and attracted insects. Defendant continued to live in the house. Eventually, defendant screwed shut and sealed the windows in Schaefer's room and the rest of the house, along with the doors. In screwing shut the door to Schaefer's room, he also caulked between the door and the doorframe, put duct tape over the caulk, installed trim over the tape, and painted the trim. In June 2012, defendant left to go on a cross-country trip. Defendant, according to the State, had a history of drinking alcohol to excess, renting the upstairs unit to women, dating his renters, and then abusing them. In 2007, two domestic battery incidents involving defendant and Schaefer occurred at the house.

¶ 9 During his case-in-chief, defendant's theory was that he was not present when Schaefer died. He last saw Schaefer in the fall of 2011 and left McHenry on June 15, 2012, to go out west. Defendant also sought to cast doubt on the physical evidence and witness credibility. As to the latter, he focused on Bitton. He had instructed her not to enter his residence. Bitton discovered Schaefer's body on November 6, 2013, and Bitton and Schaefer had a bit of a rivalry over defendant.

¶ 10                                          1. State's Case-in-Chief

¶ 11                                a. Deputy Ryan Hoven

¶ 12    McHenry County sheriff's deputy and certified evidence technician Ryan Hoven testified that, on November 6, 2013, he went to the crime scene after Schaefer's body had been discovered. He photographed the scene, and 249 of his photos were admitted into evidence. Several photos depicted water damage to the home, including fallen ceiling drywall. Photos of the kitchen depicted cleaning supplies on the counter. In another room, toward the back of the house, there was a dryer, along with a box of supplies that included brown caulk, brown paint, gloves, a screw gun, and drywall screws, which were taken into evidence. A hallway led to a work den or office, two bedrooms, and a bathroom.

¶ 13    Schaefer's body was found in the smaller bedroom, next to the den. The body, which consisted of "mostly bones" and some reddish-blonde hair, was contained within a couple of garbage bags. The room also contained a bed with clothing on it and a dresser. A stack of newspapers next to the dresser included a newspaper dated August 17, 2011. There was also mail that was addressed to Schaefer.

¶ 14    In the larger bedroom across the hall (*i.e.*, defendant's bedroom), there was a bed frame, but no mattress. No mattress was ever located. There were stains on the floor and a garbage bag. Deputy Hoven observed that the window was covered with a board that was screwed into the frame. Thus, the window was screwed shut.

¶ 15    The lower level of the house was sealed up. Nearly every door and window was screwed shut from the inside. Specifically, all of the windows, except one, were screwed shut from the inside. The exception was one window in Schaefer's room, which contained a screw hole but no screw.

¶ 16    Deputy Hoven identified photographs of the remains of the body, along with the two trash bags. Close-up photos depicted dead insects, some of which the coroner's office collected. Some bones and hair protruded from the bags. The photos also depicted a can of Lysol in the room, along with clothing. The skull had a large hole in it, and there were many bugs inside, including larvae, and around it on the carpet. Deputy Hoven testified that larvae were found throughout the body and on the floor. A receipt on the dresser was dated August 31, 2011. Another photo depicted the screw hole in the window in the room. There was also a seal on the window. The door to Schaefer's bedroom was removed and taken into evidence. The door had been screwed shut, caulked over, duct-taped, and painted.

¶ 17    In defendant's room, there was a roll of duct tape. The windows in the room were boarded up. One photo depicted a handwritten note, listing various items of property. The first item was a .45-caliber handgun with a serial number listed, government model, age three years, and valued at $542. A photo of the outside of the residence depicted a burn pit containing a box spring. In various parts of the home, investigators found caulk guns with brown caulk, a can of brown paint, work gloves, a screw gun, and spray paint. The front door had a board placed over its window with tape around it. The door also had a deadbolt that was screwed to the floor. A door on the south side of the house also had a deadbolt that went into the floor and screws on the doorframe. On the east side, a door that opened to the screened-in patio had black tape along the frame. Deputy Hoven further testified that the front door was screwed shut from the inside. A glass door was also secured from the inside.

¶ 18                              b. Deputy Teresa Harper

¶ 19    McHenry County sheriff's deputy Teresa Harper testified that, on November 6, 2013, she was dispatched to 518 North Country Club Drive to investigate a suspicious incident. Bitton had

contacted law enforcement and was present when Deputy Harper arrived at about 2:30 p.m., as was Deputy Larson, who advised that there might be human remains inside the residence, in the back room. Deputies Harper and Larson entered the front door of the residence (Bitton remained outside) and observed that the ceiling had collapsed from a water leak. Generally, the residence was in a state of disarray.

¶ 20 In the back room, the deputies lifted the top garbage bag and observed inside it bones, blonde hair, a rib cage, pants, and a spine. They put down the bag, cleared the residence, and went outside to wait for detectives. Deputy Harper testified that Bitton was upset, hysterical, and panicky. Deputy Harper did not observe that the front door had been screwed shut.

¶ 21                                    c. Detective Michael Quick

¶ 22 McHenry County sheriff's detective Michael Quick testified that he collected and documented physical evidence at the scene, including various receipts and a checkbook from Schaefer's bedroom. The date of the last recorded entry in the checkbook was September 28, 2011. He also identified a yearly planner from 2010 or 2011 located in the dining room. A receipt from Ace Hardware in Crystal Lake, dated June 4, 2012, at 12:10 p.m., listed a flashlight, caulk, a battery, "universal espresso brown" (presumably paint), and razor blades. The signature read "William" and then "J" for a middle initial.

¶ 23 Other items that Detective Quick identified included duct tape, a paintbrush, air freshener, garbage bags, rubber gloves, a paint can, drywall screws, and spray paint. There were other home-improvement items in the house and the garage that the evidence team did not collect.

¶ 24 Detective Quick swabbed for potential blood the walls of defendant's room and Schaefer's room, along with the carpet area where Schaefer's remains were found.

¶ 25                                    d. Other-Crimes Evidence

¶ 26    Next, the State offered other-crimes evidence. The jury was instructed that it could consider it only on the issues of intent and motive.

¶ 27    McHenry County sheriff's deputy Khalia Satkiewicz testified that, on August 2, 2007, at about 12:25 a.m., she was dispatched to 518 North Country Club Drive for a domestic battery. When Deputy Satkiewicz arrived, she observed that Schaefer had bruises on her mouth, her lips were bleeding, and she was holding her right wrist, stating that it was hurting. Deputy Satkiewicz contacted the fire department.

¶ 28    Defendant was also present at the residence. He denied any knowledge of Schaefer's injuries and denied having caused them. Defendant explained that he and Schaefer had just returned from a bar. He also stated that he was "kind of" dating Schaefer and was her landlord. He spent a lot of time in her apartment, and she cooked for him. Deputy Satkiewicz arrested defendant for domestic battery. At the hospital, Deputy Satkiewicz spoke to Schaefer, who sustained a broken wrist, a bruised arm, and facial injuries. She also took photos of Schaefer's injuries, which were shown to the jury and admitted into evidence. Deputy Satkiewicz further testified that both defendant and Schaefer had a heavy odor of alcohol on their breath.

¶ 29    McHenry County sheriff's sergeant Andrew Thomas testified that, on September 18, 2007, at about 3:09 a.m., he was dispatched to 518 North Country Club Drive for a domestic incident reported to 911. When he arrived at the house, defendant answered the door, asking Sergeant Thomas what he was doing there. Sergeant Thomas responded that there might have been a domestic incident at the residence and that he needed to enter. Defendant responded that Sergeant Thomas had no right to come inside the house. While standing at the front door, Sergeant Thomas observed Schaefer, who was crying in the living room.

¶ 30    Sergeant Thomas entered the home and noticed that the living room was "somewhat of a mess."  A coffee table was tipped over and there were beer cans strewn throughout the room, as well as an empty vodka bottle on the floor.  Defendant told Sergeant Thomas that Schaefer was his girlfriend, that she had been staying with him for the past week, and that they had been drinking all day and night.  Four hours earlier, Schaefer began to " 'freak out.' "  She punched defendant in the head with a closed fist, put her arms around his neck to try to strangle him, and, later, yelled and tipped over the coffee table.  Sergeant Thomas did not observe injuries on defendant and, when he asked defendant if he was injured or needed medical attention, defendant replied in the negative.

¶ 31    Sergeant Thomas smelled an odor of alcohol on defendant's breath, defendant had reduced motor skills, slurred speech, and red and watery eyes, and he was "clearly intoxicated."  Schaefer had a swollen and bloody lip, there were abrasions around her neck, which was red, and she appeared to be slightly intoxicated.  Several photographs of defendant's residence and Schaefer were admitted into evidence.  Sergeant Thomas asked defendant how Schaefer sustained her injuries, and he replied that she had fallen down.  Defendant denied punching, kicking, pushing, or strangling Schaefer.  Sergeant Thomas did not find any weapons inside the home.  He thoroughly searched the home because Schaefer had complained that there might be weapons in it.  He arrested defendant for domestic battery.

¶ 32                                     e. Ralph Jones

¶ 33    Ralph Jones lived in a house across the street from defendant's residence.  He had known defendant for about 25 years and saw him a couple of times per week carrying beer into his home.  Jones had never been inside defendant's home and never had a conversation with defendant.  Jones described defendant as very unkempt and unshaven, with unwashed hair and dirty clothes.

Jones also had known Schaefer, whom he described as very petite, with long blonde hair. After a while, Jones stopped seeing defendant (and his vehicle) at the residence. He never saw Schaefer after he stopped seeing defendant. There was "a lengthy period" during which defendant still occupied the house and Schaefer was no longer present. However, her vehicle was still in the driveway for about two weeks, and then it was gone.

¶ 34    Jones met Bitton after defendant had left, and they had a conversation concerning leaking pipes at the house. He advised Bitton not to tamper with the house. About one month after the last time that Jones saw defendant, he observed sheriff's officers responding at the house because pipes were leaking.

¶ 35                                    f. Deniece Greve

¶ 36    Deniece Greve testified that she worked as a manager at Ace Hardware in McHenry. She identified receipts that reflected defendant's purchases on June 2, 3, 4, 6, and 9, 2012, of screwdrivers, screws, nails, a flashlight, caulk, batteries, razor blades, a scraper, a drill and charger, light bulbs, steel wool, spray paint, air freshener, duct tape, paint, and numerous items from the dollar section. Defendant used a credit card for his purchases.

¶ 37                                    g. Dr. Larry Blum

¶ 38    Dr. Larry Blum testified that he specialized in forensic pathology. He reviewed Dr. Nancy Jones's forensic pathology report and other materials, because Jones was unavailable to testify.

¶ 39    Dr. Blum opined that the cause of Schaefer's death was two gunshot wounds, one entering and passing through her head and one entering and passing through her spine. (Over 60 photographs of the remains and the area where they were located were admitted into evidence and published to the jury.) Dr. Blum explained that Schaefer's remains were found in two black garbage bags that were covered with a tarp. There were several types of insects noted at the scene

on or in the vicinity of the remains. He identified several defects in the skull, which were caused, in Dr. Blum's opinion, by a gunshot wound, entering the left front lobe and exiting on the right temporal parietal bone. Most of the body was skeletonized, but there was some soft tissue attached that had become adipocere. Dr. Blum noted several fractures that occurred post-mortem, including on the sternum/breastbone and the right ulna. He also identified injuries to the thoracic vertebrae.

¶ 40    To a reasonable degree of medical certainty, Dr. Blum believed that Schaefer suffered her gunshot wounds while still alive. He could not identify the caliber of the bullet that caused the wound to Schaefer's skull.

¶ 41                            h. Jennifer Monteleone

¶ 42    Jennifer Monteleone testified that she worked at Home Depot as a district asset- protection manager. She identified receipts for purchases made at the McHenry store on June 2 and 3, 2012.

¶ 43                            i. Malgorzata Pribek

¶ 44    Malgorzata Pribek testified that she lived at 510 North Country Club Drive, which is next to defendant's residence. She last saw defendant in May or June 2012. She had last seen Schaefer in January 2011.

¶ 45                            j. Neal Haskell

¶ 46   Neal Haskell, an expert in forensic entomology, testified that he examined four samples of insects taken from the scene, four from the autopsy, photographs of the scene, and certain reports. The insects included coffin flies and beetles (including larvae and adults) and green bottle flies. Haskell found peritrophic membrane, which insects produce during digestion. The insects are very specific to dead and decomposing animals or humans. Haskell also checked

weather information (for McHenry County, not specifically 518 North Country Club Drive) to assess whether the flies would be active at certain times.

¶ 47    Haskell opined that Schaefer died sometime during the warmer months, between October 2011 and June 2012 (*i.e.*, before defendant left on his trip). He based this opinion on the presence of multiple generations of dermestid beetles (they prefer a body that has become very dry) and the peritrophic membrane, which had dried out. Also, the skeletal remains were very dry.

¶ 48    Haskell had been told that the house was vacated in June 2012 and he later learned that a number of people had entered the house between June 2012 and November 2013. Haskell clarified that his opinion remained the same whether or not people had entered the residence. Haskell further testified that it was not likely that Schaefer died between June 15, 2012, and June 30, 2012, though it was possible. It was also possible, but not likely, that Schaefer died in July, August, or September 2012.

¶ 49                                k. Renee Bitton

¶ 50    Bitton testified that she was taking care of the 518 North Country Club Drive residence. She met defendant in August 2001. Defendant lived at his residence in 2011. The house had more than one apartment in it. Bitton did not know if someone was renting the upstairs unit in 2011, but Schaefer lived at the residence.

¶ 51    Defendant left the residence on June 15, 2012. Bitton lived in Fox Lake at the time, and defendant came to say goodbye. He had camping gear with him and told Bitton that he was going on a road trip. Defendant asked Bitton to cut the grass at his residence and told her to stay out of the house. Bitton did not see defendant again until after November 6, 2013. However, defendant called her daily. When they discussed the house, "[c]onstantly [she] was told [by defendant] not to go inside the house." She obeyed until the pipes burst on January 29, 2013. On that day,

Bitton and her friend Jerome Mikos stopped by to check on the house. Bitton observed water pouring down the walls. She was concerned about damage to the inside of the home. She contacted the sheriff's office, and an officer responded. Bitton also contacted defendant and told him what was happening at the residence, and he responded "[l]eave it alone. Stay out of the house." Nevertheless, Bitton entered the house. Bitton explained that the back door was screwed shut from the outside. She and Mikos unscrewed it, and she entered the residence. There was water on the floor. The power was still on, and Bitton turned around and left.

¶ 52   Between January 29, 2013, and November 2013, Bitton (with one or more friends, including, at various times, Mikos, Dawn Jorda, Sherrie Kent, and Stan Parlow) entered the residence about seven times to remove debris, wet furniture, and papers, to remove old food from the refrigerator, and to sanitize the premises. She also removed a stained mattress from defendant's bedroom and burned it. It was 30 years old and had many stains on it; however, she did not notice any reddish-brown stains.

¶ 53   Bitton testified that she last saw Schaefer riding her bike, probably in the summertime. Bitton also said that, when defendant came to say goodbye in June 2012, Bitton had not seen Schaefer for what "could have been" 1½ years (*i.e.*, since about January 2011). She had asked about Schaefer in June, in either 2010 or 2011, and defendant told her that she had moved to Missouri.

¶ 54   On November 6, 2013, the day she discovered Schaefer's remains, Bitton went to the residence with Mikos to retrieve a space heater from the sealed back bedroom (*i.e*., Schaefer's room). She had first noticed the sealed room in March 2013 and had asked defendant about it; he replied that he had valuables stored in the room. However, defendant had a laptop, a guitar, a big-screen television, and other valuables that were not sealed in the room. After Bitton and

Mikos unsealed the room, Bitton entered the room. Bitton saw a tarp and a bag by the door. She stepped over them and noticed that Schaefer's belongings were still in the room, including clothing, books, and a laptop. Bitton retrieved the space heater and moved the tarp. She saw a bag that had small insects around it and opened the bag. Bitton also saw what looked like a human rib cage. She was scared and ran out of the house. Mikos was outside, and she instructed him to call the police. Mikos first went inside to look at what Bitton had discovered. Bitton made some calls. She contacted Michael Oliver, a retired police officer she knew who lived nearby. Bitton also contacted the sheriff's office.

¶ 55    At one point while visiting the property, Bitton found a bullet between the front door and its storm door. The top of the bullet was smashed in. She told defendant about the bullet. Bitton gave the bullet to her friend Steven Pakulla. About November 8, 2013, Bitton told police about the bullet, but she denied that she told police that she threw the bullet in a garbage can. She recalled telling Detective Michelle Asplund that she had kept the bullet, showed it to friends, and then lost it. However, she testified that she also told Detective Asplund, after the detective confronted her with her statement that she had thrown the bullet away, that she had forgotten that she had not thrown it away. "It slipped my mind." "It was gone. I didn't really know if I had lost it or thrown it away. I lose things." She continued, "No, I did not throw it away, but I misplaced it or—."

¶ 56    Initially, Bitton did not tell police about the mattress, because it did not come up. Then she stated that she did tell police that she had taken the mattress out of the residence and burned it. There was no particular problem with insects in defendant's bedroom as opposed to the rest of the house. "The whole house was pretty filthy" for a long time and was abandoned.

¶ 57                                    l. Jerome Mikos

¶ 58      Mikos testified that, in 2012, he dated Bitton.  He knew defendant through Bitton.  Bitton spoke to defendant and worked for him after he left, including cutting the grass.

¶ 59      In the summer of 2012, Bitton ran errands for defendant, including buying cleaning supplies, black plastic bags, etc.  Mikos testified that he did not enter defendant's house, because defendant did not want anyone in the house.  When Mikos came to the property, defendant would come out to the garage so Mikos could not go any farther.

¶ 60      After defendant left to go on his trip, Bitton spoke to him daily and ran errands for him. Defendant paid her.  Bitton and Mikos were instructed not to enter the residence.  Defendant gave these instructions often on the phone (which Mikos overheard because Bitton had it on speaker mode).  Mikos sometimes accompanied Bitton when she took care of defendant's residence. Bitton did not have a key to the property.  Defendant stated that he would return soon but did not say when.

¶ 61      In January 2013, Mikos discovered that the pipes were leaking in the residence.  Through a window, he observed water coming down the walls.  Bitton contacted the police, who could not do anything about the issue.  Defendant, whom Bitton had contacted, suggested cutting the wires on the well pump "so [they] didn't have to go inside."  Mikos was uncomfortable with this plan because he did not want to cut a live power line.  Defendant did not tell them that they could go into the house.  Eventually, Mikos called ComEd to pull the meters, which stopped the well pump. Mikos and Bitton entered the home through the back door, from which they had to remove screws because the door was screwed shut from the inside and outside.  They also had to kick it open. Mikos was in the home for about one hour.  He went inside to check everything out, since he knew that the power was off.  It was a mess.  Ceiling material was on the carpet and the television. Mikos did not notice the sealed bedroom.

¶ 62    On November 6, 2013, Mikos accompanied Bitton to the residence to help her clean up. Bitton was mad at defendant about something and wanted to enter the sealed bedroom; she also wanted the space heater that was in that room. Mikos helped Bitton unseal the door, using a box-cutter knife and a flat bar. "It wasn't too hard" to open the door. He saw a blue tarp and then went outside. Bitton then came running out of the house, crying. Mikos went inside to see what Bitton discovered. He opened a black bag and saw ribs and a leg. Mikos went outside, and they contacted the police.

¶ 63    Mikos further testified that he could not recall whether the front door was screwed shut when he and Bitton discovered the body, but the side door was screwed shut. He and Bitton did not screw shut the back door after opening it in January 2013.

¶ 64                                    m. Blake Aper

¶ 65    Blake Aper, a forensic scientist in the biology and DNA section of the Illinois State Police Rockford Forensic Science Laboratory, testified as an expert in forensic DNA analysis. He compared a DNA profile from defendant with one from a piece of latex glove found on duct tape located in the bathroom adjacent to the bedroom where Schaefer's remains were found. Aper opined that defendant could not be excluded as having contributed to the DNA profile found on the latex glove. Aper also compared defendant's DNA profile to a profile from duct tape removed from the door frame (which also had a piece of latex stuck to it). He opined that defendant's DNA profile matched the DNA profile from the piece of latex.

¶ 66                              n. Deputy Charles Hoffman

¶ 67    McHenry County sheriff's deputy Charles Hoffman testified that, on January 29, 2013, he responded to a call reporting a water leak at defendant's residence but did not attempt to enter the house. Deputy Hoffman walked around the house to look in the windows. An attempt to

contact defendant was not successful. Deputy Hoffman spoke to Bitton and Mikos. He told Bitton not to enter the home without defendant's permission.

¶ 68                              o. Detective Ed Maldonado

¶ 69    Detective Maldonado testified that he subpoenaed defendant's financial records. He also reviewed eight transactions from Ace Hardware and Home Depot dated June 2 through 6 and June 9, 2012. Detective Maldonado spoke to Greve at Ace Hardware and Adam Kasprzka at Home Depot. He also reviewed Schaefer's checkbook and found various debit and benefit cards in her name. Detective Maldonado reviewed a day planner that he believed belonged to Schaefer. It contained her name, her address, and a piece of mail addressed to her. Its last entry was dated September 29, 2011.

¶ 70    On November 9, 2013, McHenry County detectives Ed Maldonado and Thomas Jonites traveled to Las Vegas and met with defendant at the Clark County jail. Detective Jonites asked most of the questions, and the interview was audiotaped and videotaped. The videotape was played for the jury.

¶ 71    In the video, the detectives questioned defendant about Schaefer and his properties, neighbors, and weapons. Defendant related that he had met Schaefer three years earlier when she responded to an advertisement for an upstairs rental unit in his home. While they lived together, defendant and Schaefer dated on and off. After a while, Schaefer began talking about moving to Missouri, where a lot of her things were stored. At one point, after defendant returned from a business trip, Schaefer was gone. He believed that it was October, November, or December of 2011.

¶ 72    Defendant left McHenry in the summer of 2012 for a road trip across the country. Before he left, defendant sealed up his residence, including screwing shut most of the windows and

doors. Defendant was concerned that Bitton would break in and take valuable items. Defendant owned another property close by, at 608 Country Club Drive, that he used for investment purposes. Other than Social Security income, he invested in the stock market.

¶ 73    Defendant denied knowing what happened to Schaefer. He stated that she had a lot of enemies. Schaefer's bedroom was across the hall from defendant's bedroom (at some point, she moved out of the upstairs rental unit and into a bedroom on the main level). Before he left McHenry, defendant "might have" sealed the door to Schaefer's bedroom by screwing it shut. He screwed shut all of his doors. Defendant denied that he caulked and painted over the screws on Schaefer's bedroom door.

¶ 74    The detectives asked defendant about his ownership of firearms. Defendant stated that he owned a rifle/shotgun and also had two handguns that he inherited from his father: a .22-caliber handgun, which he had put in a closet, and a .45-caliber handgun.  Two or three "45s" and two other weapons had been stolen from him in the past. One of the 45s was stolen by a "Mr. Ed" while defendant lived in Streamwood.  Defendant denied owning a Colt .45-caliber government model 1911 with Pachmayr grips that was listed (with a serial number) on a handwritten note on a yellow sheet of paper found in his house.  (The note was admitted at trial and it also referred to two boxes of .45-caliber cartridges and five boxes of shotgun shells.)  However, he conceded that he owned an Army-issued "one."

¶ 75    Bitton did various jobs for defendant at his home.  Before he left McHenry, Bitton cleaned up glass after the front window of defendant's home broke.  Defendant did not know how it broke. Bitton, the detectives reported, claimed that she found a .45-caliber slug in the glass debris by the front door and told defendant about it on the telephone.  Defendant told the detectives that Bitton told him that she found the slug in the yard, and he surmised that it was there because children in

the neighborhood shoot guns. A couple of months before he left McHenry, defendant told Bitton that he did not want her in his house anymore. He told the detectives that Bitton was a thief and was stealing things from him.

¶ 76 Defendant again denied knowing what happened to Schaefer. Defendant asked the detectives how they knew that Schaefer did not "go floating down the river or something." (Defendant's property abuts the Fox River.) "Maybe she's suicidal."

¶ 77 Eventually, the interrogation became confrontational, with Detective Jonites accusing defendant of killing Schaefer, putting her body into two plastic bags (which he claimed contained defendant's fingerprints), caulking the door to Schaefer's room shut once the smell became unbearable, and eventually leaving town. He also questioned defendant's story that he sealed the house to protect his valuables, pointing out that he left a "nice Harley" in the garage, which was not sealed. At this point, defendant requested an attorney and the interrogation concluded. (Defendant was arrested by McHenry County detectives on July 24, 2014.)

¶ 78 Detective Maldonado testified that he knew that defendant was a severe alcoholic. In the videotape, defendant is seen in a wheelchair. Detective Maldonado also knew that defendant was well educated and had been gainfully employed, selling HVAC equipment.

¶ 79 Detective Maldonado testified that, during the interview, the detectives told several lies, including that fingerprints were found on the garbage bags. Even though the detectives exaggerated the strength of the evidence against him, defendant never confessed.

¶ 80                          2. Defendant's Case-in-Chief

¶ 81                             a. Michael Oliver

¶ 82 Oliver testified that he had known defendant for about 25 years. Oliver owned property at 516 North Country Club Drive, adjacent to defendant's home. Oliver testified that, over the

years, defendant's appearance changed. In recent years, defendant was not taking care of himself, including his personal hygiene.

¶ 83    Beginning in the early summer of 2012, Oliver noticed that defendant was gone. By January 2013, defendant's property appeared to be abandoned. Also that month, water pipes burst at the residence and the ceiling collapsed. Between when the pipes burst and Schaefer's body was discovered, Oliver entered the residence on two occasions, in the summer and the fall of 2013. The first time he entered, the outside lights were on, doors were open, the screen door was in the open position, and the interior doors were open. Inside, Oliver observed that the ceiling had collapsed onto the main floor and the house was in disarray. There was mold on the walls. Oliver walked into one bedroom and observed clothes thrown everywhere and a mattress on the floor. He did not see a door sealed with caulk. The second time he entered, the interior looked very much the same, but the plants growing in the carpeting had gotten larger. He did not notice a room that was sealed or caulked shut.

¶ 84    Oliver explained that he entered the house because he felt something was wrong, with no one around but the lights on and the doors open. However, he did not contact the sheriff's department. He knew that Bitton was taking care of the home.

¶ 85                                b. Sherrie Kent

¶ 86    Kent testified that, in the summer or fall of 2013, she entered defendant's residence with Bitton and Jorda. Bitton had told her "about the door that was boarded up and said it was weird." Kent saw the sealed door, but she also observed a mattress in the adjoining bedroom (*i.e.*, defendant's bedroom). The bedroom was cluttered and everything was a mess. The mattress was "way low," but she could not recall if it was on a bed frame. The mattress had a large, dark brown stain, about 18 inches in diameter.

¶ 87                              c. Stipulation Concerning Jorda

¶ 88    The parties stipulated that, on August 21, 2015, a private investigator interviewed Jorda. If called to testify at trial, Jorda would testify that she had known defendant for a long time and that she had met Schaefer only once, at defendant's house and in Bitton's presence. Bitton was showing Jorda a new sewing machine. Schaefer jumped to the conclusion that Bitton was selling or giving Jorda the machine, and it had to be explained to Schaefer that she was not.

¶ 89    Jorda had been in defendant's home numerous times before he left in June 2012. After he left, some time passed before Jorda went inside the house, because Bitton told her that defendant did not want anyone in the house.

¶ 90    Bitton would call Jorda for help in maintaining the house. Eventually, the restriction about being in the house was eased, and Jorda and others were permitted inside. However, Bitton told her that defendant stated that he wanted everyone only in the kitchen or living room.

¶ 91    Jorda could not provide the investigator with a reasonably accurate estimate of the number of times she was in the house before Schaefer's body was discovered. When asked if it was 25 times, she answered that it was probably more.

¶ 92    Jorda observed the door sealed with brown caulk and commented "what the" to Bitton, who had no explanation.

¶ 93                              d. Defendant

¶ 94    Defendant, then age 64, testified that he retired in 2013. He denied killing Schaefer, did not know who killed her, and was not present when she died.

¶ 95    Defendant met Schaefer in 2007 after he placed an advertisement in the newspaper for the rental apartment above his residence. Schaefer became his renter and, eventually, they started dating (for a few years).

¶ 96     Defendant last saw Schaefer in the fall of 2011. She was living with defendant at his residence and had her own room. They were no longer dating. In the fall of 2011, defendant was visiting a friend in Wisconsin, and, when he returned, she was gone. He did not see Schaefer leave. He assumed that she moved to Missouri, because she had mentioned doing so numerous times.

¶ 97     Between the fall of 2011 and June 15, 2012, defendant lived at the residence and drank on a regular basis. He purchased home supplies for years, including from Home Depot, Menard's, Ace Hardware, and other places. He purchased caulk, tools, sandpaper, paint, drill bits, nails, etc. Defendant decided to leave Illinois on June 15, 2012, because he was retired and wanted to visit his sister and friends around the country. After he left, he kept in contact with Bitton, whom he had met in 2001 and had dated for a couple of years. Bitton knew Schaeffer.

¶ 98     When he left Illinois, defendant had arranged for Bitton to maintain the outside of his residence and mow the lawn. He paid her. Defendant denied that, before he left, he sealed Schaefer's bedroom. However, he did lock up the house and secure most of the doors and windows by screwing them shut. He had important items all over his house and did not want anyone, including Bitton, to steal them. The cabinets in his office were locked when he left. Defendant never gave anyone permission to open the cabinets.

¶ 99     Defendant did not know how his DNA got on Schaefer's door. He had enemies, and someone might have planted it there. Bitton and possibly her friend might have done it. Bitton was often not very friendly. Defendant believed that his enemies conspired to frame him for homicide.

¶ 100   Defendant did not know why Schaefer left her identification (Missouri), credit cards, and checkbook in his house if she moved to Missouri. Schaefer had enemies, including a man, Mark

Brier,[1] she used to live with in Missouri whom she had gotten arrested. Also, she hung out with a motorcycle gang in Missouri and told defendant that they were all involved in drugs and that there was a problem with a "meth" lab there. Also, Schaefer had issues with her parents and, although defendant did not believe the story, she told him that people in her family wanted her dead because they had an insurance policy on her. Defendant told Detectives Jonites and Maldonado that he had heard (from Bitton and others) that Schaefer was a drug dealer. However, she never did drugs around defendant.

¶ 101   Addressing the two prior domestic violence charges involving Schaefer, defendant denied that he beat up Schaefer or broke her wrist. He thought that she fell down or that someone else injured her. Regarding the September 2007 incident, defendant left the bar ahead of Schaefer, went home, and went to bed. At one point, the police knocked on the door and stated that Schaefer complained that defendant had pushed her. He was arrested.

¶ 102   Defendant told Detectives Jonites and Maldonado that Schaefer had talked about suicide, but he did not think she committed suicide. "She talked about a lot of crazy things beside that so—."

¶ 103   Defendant sealed the windows because Bitton would open windows in the winter after defendant had weather-sealed them. He also did not want anyone to steal his valuables, which included stereo equipment, televisions, guitars, clothes, financial documents, computers, fax machines, books, and memorabilia. He was concerned about Bitton's friends, whom he did not want around.

---

[1]The record also contains references that spell his name as "Breier." For consistency, we use "Brier."

¶ 104   Defendant spoke to Bitton about every other day while he was on his trip. He instructed Bitton not to enter the house, because he did not want her to take or destroy anything, have her friends over for parties, or to engage in illegal activities. Defendant explained that, when the pipes burst, he told Bitton to cut the power so the water pump would stop.

¶ 105   Addressing his ownership of firearms, defendant testified that "Mr. Ed" took his .45-caliber weapon "a long time ago" when defendant lived in Streamwood. Five guns had been stolen from defendant. Two were during residential burglaries, where more items were stolen. The .45-caliber weapon with Pachmayr grips listed on the yellow piece of paper was presumably lost. Defendant was going to report it to the police, but they told him that he had to come into the station and, after discussing it with Bitton, he decided that it was not worth it. Defendant had contacted police in Fox Lake about another missing firearm, and they told him that a missing firearm is generally almost impossible to locate.

¶ 106   Defendant had told detectives that Bitton informed him that she had found Schaefer with a needle in her arm and that she had died of an overdose. Bitton was a friend, but she was also a thief and a liar. When she told him about Schaefer, she was probably withdrawing from cocaine which she regularly used. "It's not a secret." Nevertheless, defendant agreed to let her take care of the outside of his property, because it was less expensive than paying a landscaping company. He trusted her to a point, but he took his chances.

¶ 107                                          3. Verdict

¶ 108   The jury found defendant guilty of first degree murder. On July 27, 2016, defendant moved for a new trial, and the trial court denied the motion. On November 9, 2016, the trial court sentenced defendant to 24 years' imprisonment on the first degree murder conviction and 25 years for the mandatory firearm enhancement, for a total of 49 years imprisonment (plus three years'

MSR).  In announcing its sentence, the court noted that the evidence against defendant was "completely overwhelming."

¶ 109                                 C. Direct Appeal

¶ 110   On direct appeal, defendant challenged the (1) admission of his statements to detectives, arguing that he did not knowingly and intelligently waive his *Miranda* rights; (2) admission of other-crimes evidence of his alleged abuse of Schaefer in 2007; (3) admission of evidence of his ownership of firearms; and (4) sufficiency of the evidence against him.  This court affirmed the trial court's judgment.  *Ross*, 2018 IL App (2d) 161079.  As relevant here, we rejected defendant's challenge to the sufficiency of the evidence against him, holding that the evidence of his guilt was overwhelming.  *Id.* ¶¶ 191-201.  We also held that the trial court did not err in admitting evidence of defendant's prior, *i.e.*, 2007, alleged abuse of Schaefer and that the admission of the evidence of defendant's firearms ownership was erroneous but the error was harmless because the evidence of his guilt, without the firearms evidence, was overwhelming.  *Id.* ¶¶ 162-189.

¶ 111            D. Initial Postconviction Petitions and Appeal Therefrom

¶ 112   On June 26, 2019, defendant filed a petition seeking postconviction relief, and, on September 20, 2019, the trial court summarily dismissed the petition.  However, also on that date, defendant moved to withdraw his petition.  On September 23, 2019, the court granted defendant's motion and, on its own motion, withdrew its September 20 decision.

¶ 113   On September 18, 2020, defendant filed a first amended postconviction petition, and, on January 20, 2021, the trial court summarily dismissed the petition.  It determined that, when defendant electronically filed the petition it was not simultaneously docketed.  The docketing date, the court found, was January 7, 2021.  After the court denied defendant's motion to reconsider, defendant appealed.  On June 3, 2022, this court held that defendant's amended petition was

docketed on the same date on which it was filed and, thus, the trial court was without authority to summarily dismiss it on January 20, 2021, more than 90 days later. *People v. Ross*, 2022 IL App (2d) 210068, ¶ 30. We vacated the court's dismissal and remanded for stage-two proceedings under the Act. *Id.*

¶ 114                    E. Second Amended Postconviction Petition

¶ 115   On February 24, 2023, defendant, represented by the same attorney who represented him on direct appeal, filed a second amended postconviction petition, arguing that (1) he received ineffective assistance of trial counsel, (2) his rights under *Brady* were violated, and (3) he was actually innocent. As to his ineffective-assistance claim, defendant first asserted that trial counsel failed to present an expert witness regarding the time of death to rebut Haskell's testimony. Defendant wanted to establish that Schaefer died after June 15, 2012, the date he left Illinois. He discussed this with trial counsel, and counsel assured him that an expert would be retained. However, counsel informed defendant that the expert wanted too much money to render her opinion, so counsel unilaterally decided, against defendant's wishes, to not present her testimony. This action forced the jury, defendant argued, to believe Haskell's timeframe regarding the time of death, notwithstanding its inherent flaws.

¶ 116   Next, defendant argued that trial counsel was ineffective for failing to present several witnesses who would have supported his innocence or did not properly present witnesses who were called to testify. As to Bitton, he argued that counsel failed to (1) properly highlight that defendant was not physically and mentally abusive toward her, (2) properly cross-examine Bitton concerning her conflicting statement to police about finding the bullet on defendant's property and what she did with it, (3) elicit testimony from Bitton concerning her knowledge of defendant's gun ownership and the disposition of one of his firearms, and (4) rebut the State's assertion that his

directive to Bitton that she stay outside of his home meant that he was attempting to preclude her from discovering Schaefer's body; he asserted that Bitton had extensively damaged his property in the past and was charged with a felony as a result, and her behavior corroborated his theory that she was involved in killing Schaefer, not defendant; his actions, he maintained, were reasonable in attempting to keep Bitton away from his possessions.

¶ 117    Next, defendant argued that counsel was ineffective in eliciting exculpatory testimony from Oliver, who, while in defendant's home in 2013 (as related in an investigative memorandum dated July 7, 2015), observed Schaefer's bedroom door and stated it was not sealed shut. Defendant asserted that the only reasonable inference from this testimony was that Schaefer's body was not present in the room at that time and that she was murdered some time afterward. As defendant had left in June 2012, these facts, he maintained, exonerated him. Bitton discovered the body after forcing her way into the room through the sealed door; if the door was not sealed in 2013, he asserted, Bitton's story about discovering the body was false. Due to the manner in which trial counsel conducted his direct examination of Oliver, defendant argues, the jury did not hear Oliver specifically testify that, while he was in the master bedroom in 2013, he observed the third bedroom door and it was not sealed.

¶ 118    Next, defendant asserted that trial counsel was ineffective in failing to elicit testimony from Kent that the mattress was bloodstained when she saw it in August or September 2013, as set forth in an investigative memorandum dated May 21, 2015. Defendant also claimed that the jury never heard Kent testify that she told police that many people visited the home, including Jorda, Nicholas Galdine, Nicholas Nae, a man who she identified as "Jerry," and additional friends of Bitton who engaged in heavy drug use. Further, defendant asserted that Kent provided information that cast doubt on Bitton's credibility, including that Bitton had tried to get Kent to recant her statements

about the mattress and sealed door. Kent also told police that Bitton hid information from law enforcement. The inference from Kent's knowledge, defendant asserted, was that Bitton was involved in Schaefer's murder after defendant left on his trip in 2012.

¶ 119 Next, defendant asserted that trial counsel was ineffective for failing to adequately prepare defendant for his testimony, including cross-examination. Counsel did not elicit, on either direct or re-direct examination, defendant's explanations regarding his prior gun possession, alleged domestic battery charges, Schaefer's potential enemies, Bitton's suspicious statements to him suggesting her involvement in Schaefer's death, and why he did not allow Bitton inside his home. Counsel also refused, he argued, to introduce photographs that the State possessed of construction and repair materials inside his garage to explain how defendant was heavily involved in home construction projects. This also would have explained why his DNA may have been on a glove near the third bedroom door where Schaefer's body was found.

¶ 120 Defendant also argued that trial counsel failed to object to the State's inflammatory comments during closing arguments. Specifically, he asserted that the remarks included references to the Hell's Angels gang and Mr. Ed, suggesting that defendant claimed they murdered Schaefer. Defendant did not make these claims, and counsel did not object, he asserted. Defendant also asserted that the State argued that defendant had stated that Schaefer's family had her killed to collect life insurance money, but defendant never stated this and merely relayed what Schaefer had told him about her family taking out a life insurance policy on her. He testified that he thought the idea of her family killing her was ridiculous. Counsel did not object to the State's argument on this point and, as a result, the jury would have been enflamed against defendant.

¶ 121 Defendant argued that he was prejudiced by trial counsel's deficient performance because the evidence could not be deemed overwhelming. At best, he asserted, it was closely balanced

and, thus, but for the foregoing errors, there was a strong likelihood that the jury's verdict would have been different.

¶ 122   Next, in his *Brady* claim, defendant argued that the State concealed evidence that Schaefer had enemies and that at least one of them had threatened to physically harm or kill her.  Defendant asserted that he had recently learned, via an open records request, that investigators had learned prior to trial that others sought to harm or kill Schaefer.  In November 2013, investigators contacted the Springfield, Missouri, police department and requested all reports relating to Schaefer, specifically, seeking to determine whether Brier had been involved in her death.  Springfield police learned that Schaefer had reported that Brier had conspired to cause her death in order to recover insurance money, the murder plot was the result of her reporting Brier's criminal involvement in running a "meth lab," and she had contacted police about Brier causing a domestic disturbance and obtained an order of protection against him, which he had violated.  None of this information, defendant asserted, was disclosed to him prior to his records request, and trial counsel was not provided with this information.  The documents, defendant argued, strongly suggested that Schaefer was murdered by someone other than defendant and he was prejudiced by the failure to provide the information to him.  The disclosure of the information, he asserted, would have provided him with a strong defense and supported his testimony.  Without it, he appeared to lack credibility on cross-examination.  He noted that he had testified on cross-examination that Brier was Schaefer's enemy and had threatened her.  Defendant also noted that he testified that Schaefer hung out with a motorcycle gang in Missouri and that there were individuals who may have been after her with regard to drug dealing and a meth lab operation.  Had the documents been available, he argued, the prejudice to him from the State's closing arguments wherein it presented defendant

as a liar ("There's no biker gang from Missouri and there's no Mark Brier, the guy she had arrested.") would have been diffused.

¶ 123 Finally, defendant argued that the evidence not admitted due to trial counsel's ineffectiveness and the State's failure to disclose it was of such a conclusive character that, had it been admitted, the outcome of the trial could likely have been different. The documentation withheld that gave rise to his *Brady* claim, he asserted, also constituted new evidence that supported his actual innocence claim.

¶ 124 The State moved to dismiss defendant's petition, and, on April 19, 2024, the trial court granted the State's motion. The court found that defendant's assertion that someone else committed the crime was a nonfactual assertion that amounted to a conclusion, and the issue was barred by *res judicata*, as the sufficiency of the evidence was raised and decided on direct appeal. Next, addressing defendant's claim that trial counsel was ineffective, the court initially found that defendant's claim was forfeited because appellate counsel, which was not the same as trial counsel, could have raised it on appeal but did not. Next, the court found that defendant's allegations were conclusory or not supported by the record, and defendant did not show substantial prejudice resulting from counsel's alleged failures. Second, addressing defendant's *Brady* claim, the court found that the evidence concerning Brier was remote or speculative, the allegations were not well pleaded, and no affidavits were attached supporting them. Finally, the court addressed defendant's actual innocence claim and determined that he had not shown that there was newly discovered evidence. As to the mattress, the court found that it was unclear how it would have been of such a conclusive character to have changed the outcome of the trial. "[I]t would be speculative, at best. It's not newly discovered. There was testimony regarding some aspect of this information at trial." Defendant appeals.

¶ 125                                    II. ANALYSIS

¶ 126   Defendant argues that the trial court erred in dismissing his postconviction petition at the second stage, where he made a substantial showing that (1) his right to effective assistance of trial counsel was violated; (2) his rights under *Brady* were violated where the State concealed evidence that Schaefer had enemies and that at least one of them had abused her, stalked her, and made multiple threats to kill her; and (3) he is actually innocent.  For the following reasons, we reject defendant's claims.

¶ 127   The Act provides a means for people under criminal sentences to assert that their convictions resulted from substantial denials of their constitutional rights.  *People v. Smith*, 2015 IL 116572, ¶ 9.  It creates a three-stage process for the adjudication of a postconviction petition. *Id.*  At the first stage, the trial court independently determines, without input from the State and "[w]ithin 90 days after the filing and docketing of" the petition, whether the petition is "frivolous or is patently without merit."  725 ILCS 5/122-2.1 (West 2022).  If so, the trial court shall dismiss the petition, and, if not, the trial court is to docket it for second-stage proceedings.  *Id.*  During the second stage, the trial court may appoint counsel to represent an indigent defendant, and counsel may file an amended petition.  *People v. Hommerson*, 2014 IL 115638, ¶ 8.

¶ 128   The State must file answer or move to dismiss the petition.  725 ILCS 5/122-5 (West 2022). Dismissal is warranted at the second stage where the defendant's claims, liberally construed in light of the trial record, fail to make a substantial showing of a constitutional violation.  *People v. Hall*, 217 Ill. 2d 324, 334 (2005).  At that stage, the defendant's factual allegations not rebutted by the trial record are taken as true.  *Id.*  Also, "when assessing whether the allegations in a petition make a substantial showing of a constitutional violation, all well-pleaded facts are taken as true but nonfactual and nonspecific assertions are patently insufficient."  *People v. Wise*, 2024 IL App

(2d) 191139, ¶ 18. A defendant is not entitled to an evidentiary hearing as a matter of right (*People v. Makiel*, 358 Ill. App. 3d 102, 105 (2005)), but, rather, the defendant must make specific and factual assertions (*People v. Broughton*, 344 Ill. App. 3d 232, 236 (2003)). When, as here, a postconviction petition is dismissed without an evidentiary hearing, we review the matter *de novo*. *Hall*, 217 Ill. 2d at 334.

¶ 129 The purpose of a postconviction proceeding is to permit inquiry into constitutional issues involved in the original conviction and sentence that were not, and could not have been, adjudicated previously on direct appeal. Issues that were raised and decided on direct appeal are barred by the doctrine of *res judicata*, and issues that could have been presented on direct appeal, but were not, are forfeited. *People v. Harris*, 206 Ill. 2d 1, 12-13 (2002). However, the doctrines of *res judicata* and forfeiture are relaxed where fundamental fairness so requires, where the forfeiture stems from the ineffective assistance of appellate counsel, or where the facts relating to the issue do not appear on the face of the original appellate record. *People v. English*, 2013 IL 112890, ¶ 22.

¶ 130                  A. Ineffective Assistance of Trial Counsel

¶ 131 Defendant argues first that the trial court erred in dismissing his petition, where the petition and attached documents made a substantial showing that his right to effective assistance of trial counsel was violated.

¶ 132 Both the United States and Illinois Constitutions guarantee a defendant the right to effective assistance of counsel. See U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. The purpose of this guarantee is to ensure that the defendant receives a fair trial. *Strickland v. Washington*, 466 U.S. 668, 684-85 (1984). The ultimate focus of the inquiry is on the fundamental fairness of the challenged proceedings. *Id.* at 696. However, there is a strong presumption of outcome reliability,

so, to prevail, a defendant must show that counsel's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

¶ 133 Under *Strickland*, defense counsel is ineffective only if (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's error prejudiced the defendant. *Id.* at 687. Failure to establish either prong defeats the claim. *Id.* To prove counsel's representation was deficient, the defendant must overcome a strong presumption that counsel's performance fell within the wide range of reasonable assistance. *People v. Coleman*, 183 Ill. 2d 366, 398 (1998). As to prejudice, the burden is on the defendant to affirmatively prove that element. *Strickland*, 466 U.S. at 693. To establish prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* The prejudice component of *Strickland* entails more than an "outcome-determinative test"; rather, the defendant must show that the deficient performance of counsel rendered the result of the trial unreliable or the proceeding fundamentally unfair. *People v. Richardson*, 189 Ill. 2d 401, 411 (2000). A court need not decide whether counsel's performance was deficient before analyzing whether the defendant was prejudiced. *People v. Cortes*, 181 Ill. 2d 249, 295-96 (1998).

¶ 134 There is a strong presumption that counsel's performance was a result of trial strategy. *People v. Mason*, 268 Ill. App. 3d 249, 255-56 (1994). "As a general rule, whether to present certain witnesses is a tactical decision [that] will not be reviewed and cannot support a claim of ineffective assistance of counsel." *People v. Bell*, 152 Ill. App. 3d 1007, 1012 (1987).

¶ 135                                    1. Failure to Retain an Expert

¶ 136   Defendant argues first that the date of Schaefer's death was a crucial issue, and he sought to prove she was killed after he left his home to travel west on June 12, 2012, and, therefore, was not guilty.  The State presented Haskell to opine that the death occurred prior to June 2012, but his testimony, defendant asserts, was not definitive, where he agreed that Schaefer could have been murdered after defendant left Illinois.  Defendant contends that he asked trial counsel to retain an expert to rebut Haskell's opinion, counsel agreed to do so, but ultimately did not retain an expert. One must infer, defendant argues, that the jury accepted Haskell's testimony that Schaefer was murdered before defendant's departure.  He contends, without specifying, that valuable scientific evidence existed that he could have presented to support his key claim—that Schaefer was killed after his departure.

¶ 137   Defendant concedes that he did not present an affidavit from an expert setting forth precisely what the expert would have testified to with regard to the time-of-death issue, but asserts that one *must* infer from the record that he could have presented favorable testimony that, at the very least, would have allowed the jury to place less weight on Haskell's testimony.  This assertion is reasonable, he maintains, because he attached *his* affidavit to his petition, wherein he explained that, prior to trial, he had discussed the issue with trial counsel and counsel assured him that he would retain an expert.

¶ 138   In his affidavit, defendant averred that he discussed with trial counsel the need for an expert to establish the time of death and that counsel assured him that he would retain an expert.  He further averred that his agreement with counsel was that payments were all inclusive, meaning that expert fees were included and he assured counsel that he would pay for any experts needed. However, trial counsel did not retain an expert regarding time of death.

¶ 139 The State argues that defendant's claim is forfeited because he did not raise the issue of trial counsel's ineffectiveness on direct appeal or assert his postconviction petition that appellate counsel was ineffective for failing to raise the issue on direct appeal. See *Harris*, 206 Ill. 2d at 12-13 (issues that could have been presented on direct appeal, but were not, are forfeited); *People v. Turner*, 187 Ill. 2d 406, 413 (1999) (claims are not barred by forfeiture where postconviction counsel alleges ineffective assistance of appellate counsel for failing to raise the claim in the defendant's direct appeal). Without citing to any authority, defendant argues that his affidavit was not present in the record on appeal (it was attached to his postconviction petition) and, thus, his claim could not have been raised on direct appeal. Defendant's argument that his claim is not forfeited has some merit, but his focus is misplaced. The proper focus is the trial record. See, *e.g.*, *People v. Watson*, 2012 IL App (2d) 091328, ¶ 21 ("A defendant may raise an ineffective-assistance claim on direct appeal when the basis of the claim can be ascertained from the record."). We believe that it is arguable that defendant's claim of trial counsel's ineffectiveness is not clearly apparent from the trial record. There is no copy of any expert's date-of-death report in the record, merely, as we note below, an expert's curriculum vitae. Thus, resolution of defendant's claim on direct appeal would have required consideration of matters outside the record and appellate counsel could not have raised an ineffective assistance claim on direct appeal. In this respect, the argument is not forfeited.

¶ 140 Regardless of whether it is forfeited, defendant's claim fails on the merits because it is speculative and conclusory and, thus, not well pleaded. *Wise*, 2024 IL App (2d) 191139, ¶ 18 (in assessing substantial-showing question, "all well-pleaded facts are taken as true but nonfactual and nonspecific assertions are patently insufficient"). Defendant did not attach to his petition an affidavit from an expert who would opine in his favor on the date-of-death issue, let alone assert

that such an expert exists. He claims only that counsel informed him that he would retain an expert on the issue.

¶ 141 Defendant's argument is also rebutted by the record. Defendant was represented by two attorneys in the trial court. First, attorney Henry Sugden represented defendant up until one month before trial was set to begin in June 2016. Sugden consulted with forensic pathologist Dr. Shakuntala Teas in 2014 but ultimately did not add her to the defense witness list. Attorney Stephen L. Richards filed his appearance as substitute counsel in May 2016, and his motion to continue the trial date was granted. He sought time to "consult with an independent pathologist and to research the hiring of an expert in forensic entomology." In July 2016, Richards filed a supplemental answer to discovery, listing Erin Watson Horzelski, Ph.D., as an "expert in forensic entomology" and tendered her curriculum vitae. The jury trial commenced on July 19, 2016. Thus, the record reflects that trial counsel consulted with experts and, in the absence of an affidavit from an expert or any other similar evidence, we presume that counsel made a strategic decision not to call one, presumably because no expert would have provided opinion/testimony favorable to the defense. *People v. Patterson*, 217 Ill. 2d 407, 442 (2005) ("The decision whether to call particular witnesses is a matter of trial strategy" that will generally not support an ineffectiveness claim); see also *People v. Dupree*, 2018 IL 122307, ¶ 40 (if an ineffectiveness claim is based on "counsel's failure to discover and introduce new witness evidence," the defendant must establish both "that such evidence actually exist[s]" and "that it would have been helpful to the defense").

¶ 142                    2. Failure to Present Available Evidence

¶ 143 Next, defendant argues that he made a substantial showing that trial counsel was ineffective for failing to present witnesses and additional evidence.

¶ 144                            a. Bitton

¶ 145 First, defendant asserts that counsel was ineffective in failing to elicit exculpatory information from Bitton, who testified for the State. Bitton, according to defendant, knew that the reason for his directive that she stay out of his home was not because he did not want her to see Schaefer's body but because she had damaged the property in the past and had been criminally charged for doing so. This information, he notes, was not presented. Defendant also argues that the State elicited testimony from Bitton concerning her assertion that she found a bullet in defendant's home, which, according to defendant, implicated him and deflected blame from herself. However, he asserts that Bitton had made contradictory statements prior to trial about finding the bullet, which suggested that her testimony was fabricated. She was vulnerable to cross-examination, he contends, based on the contradictory statements, but trial counsel failed to reference them.

¶ 146 We conclude that defendant's claim concerning Bitton's cross-examination is forfeited because he could have raised it on direct appeal, did not do so, and did not raise a claim in his petition that appellate counsel was ineffective for failing to raise it. *Turner*, 187 Ill. 2d at 413.

¶ 147 Forfeiture aside, we conclude that defendant's claim concerning Bitton's cross-examination fails because he did not support his petition's assertions with any evidence and, separately, because the counsel's actions can easily be construed as trial strategy about a subject that was unlikely to produce exculpatory evidence for defendant. *People v. Jackson*, 2018 IL App (1st) 150487, ¶ 26 (whether and how to conduct a cross-examination is generally a matter of trial strategy). In his affidavit, defendant does not mention Bitton. He claims that his allegations are not refuted by the record and should be taken as true; however, the record refutes aspects of his claim. Defendant entrusted Bitton to care for his property after he left in June 2012. However, he testified that Bitton and her friends might have put his DNA on Schaefer's door, he was concerned

that Bitton and her friends might engage in illegal activities if they entered his home, and he further testified that Bitton was a thief, a liar, and she used cocaine. Thus, any additional evidence concerning Bitton and her damage to defendant's property would have been cumulative.

¶ 148 We also conclude that defendant's claim concerning Bitton's statements about the bullet also fails because trial counsel *did* cross-examine Bitton about her inconsistent statements. Specifically, counsel elicited that, at one point while visiting the property, Bitton found a bullet between the front door and its storm door. She told defendant about the bullet. Bitton gave the bullet to her friend Steven Pakulla. About November 8, 2013, Bitton told police about the bullet, but she denied that she told police that she threw the bullet in a garbage can. She recalled telling Detective Michelle Asplund that she had kept the bullet, showed it to friends, and then lost it. However, she testified that she also told Detective Asplund, after the detective confronted her with her statement that she had thrown the bullet away, that she had forgotten that she had not thrown it away. "It slipped my mind." "It was gone. I didn't really know if I had lost it or thrown it away. I lose things." She continued, "No, I did not throw it away, but I misplaced it or—." Thus, defendant's argument is rebutted by the record.

¶ 149                                  b. Oliver and Kent Memoranda

¶ 150 Second, defendant argues that trial counsel was ineffective for failing to elicit certain testimony from Oliver and Kent and to present certain evidence in the form of investigative memoranda of interviews of the witnesses that were not contained in the record on appeal. For the following reasons, we reject these claims on the merits.

¶ 151 Defendant asserts in his reply brief that he "is not making a *Brady* claim based on any non-disclosure of the [Oliver and Kent] memoranda. Assuming arguendo that the memoranda were disclosed, they were not present in the Record on Appeal."

¶ 152   As to the merits, defendant argues first that trial counsel was ineffective for failing to elicit key evidence from Oliver, where such testimony would have exonerated him. Oliver entered the home in 2013, and he observed that the door to Schaefer's bedroom was not sealed shut. This shows, defendant asserts, that Schaefer was killed (and the door was sealed) after he left and that Bitton lied. Defendant attached to his postconviction petition an investigative memorandum concerning an interview with Oliver, where he stated that he walked through the entire first floor of defendant's residence.

¶ 153   We reject defendant's argument. The unsigned investigative memorandum defendant attached to his petition is dated July 7, 2015, and is a summary of an interview by investigator R.T. Hrodey conducted at the direction of trial counsel Sugden. It provided that Hrodey met with Oliver on July 7, 2015. Oliver owns a vacant lot next to defendant's home. Between the time of the flooding at defendant's home and the discovery of Schaefer's body, Oliver kept an eye on the home and saw an open/unlocked door about three times. He walked through the entire first floor, including Schaefer's room, and he described Schaefer's room as being on the left (northwest corner) at the end of the hallway and being messy. Oliver stated that he did not see a body or smell any decomposition. Nor did he see a door nailed shut or sealed. However, when Hrodey asked Oliver if he was certain that he entered Schaefer's room, Oliver "said that his recollection was that he had but he was not positive once I began questioning him on that point."

¶ 154   Thus, the investigative memorandum overall reflects that Oliver was *uncertain* if he entered Schaefer's room. At trial, Oliver testified that, each of the two times he went into defendant's home, he *did not notice* a room that was sealed or caulked. The investigative memorandum, accordingly, is hardly exonerating, is largely consistent with Oliver's trial testimony, and does not present any factual dispute warranting an evidentiary hearing. Further, as

the State notes, if Oliver had testified that he was certain that the door to Schaefer's bedroom was not sealed, the State would likely have used the memorandum to impeach Oliver's credibility. In this respect, the evidence would not have been exonerating.

¶ 155   Second, as to the merits of his argument concerning Kent, defendant argues that trial counsel was ineffective for failing to present Kent's testimony. In August or September 2013, Kent saw what she stated appeared to be blood on a mattress. Counsel, defendant asserts, did not elicit this fact from Kent. Had this been presented, he argues, the jury would have had information casting doubt on Bitton's testimony as to her motivation for burning the mattress and/or her memory, and she would have been seen as a liar. Further, defendant argues that counsel failed to elicit from Kent testimony about Bitton's friends, their drug use, and the "unsavory" characters that visited the home with Bitton. Had the testimony been presented, he urges, the jury would have heard evidence that multiple individuals could have been responsible for the murder. He also asserts that Kent's testimony that Bitton attempted to coerce her to change her statements to the police about the mattress also would have helped show that Bitton was not credible and perhaps was involved in the murder.

¶ 156   Defendant attached to his petition an unsigned investigative memorandum prepared by Hrodey on May 22, 2015, at the direction of trial counsel Sugden. Hrodey related that, on May 21, 2015, at 3:15 p.m., he conducted an "[e]xtemporaneous" interview of Kent at her residence in "conditions less than ideal as her husband was being dropped off [at] Pioneer Center *** as he's disabled." Kent stated that, at Bitton's invitation, Kent visited defendant's residence on one occasion, in August or September 2013, with Bitton and Jorda. She saw a mattress on the lawn with "what she took to be blood stains on it." She also observed a door in the home that was sealed with caulk and boarded up. There was also a smell in the house. Kent also stated that, since she

gave her statement to police, Bitton had tried to get her to recant seeing the door boarded up and blood on the mattress. Kent described Bitton and Jorda as " 'dopers' " and heavy drinkers and she believed that Bitton was trying to find a way to get the property from defendant and " 'use' " him. When asked if she had told police about the mattress, Kent stated that she did not believe she had done so, as they came to her house when she was "tied up with her husband coming home and really didn't have time to talk."

¶ 157   We conclude that defendant did not make a substantial showing that trial counsel was ineffective for failing to elicit certain evidence from Kent. At trial, Kent testified that the mattress had a large, dark brown stain, about 18 inches in diameter. The investigative memorandum provides that Kent stated that the mattress had stains that she took to be blood stains. Thus, the evidence was not substantially different than the testimony she gave at trial and would have been cumulative. *People v. Smith*, 195 Ill. 2d 179, 190-91 (2000) (the defendant could not satisfy the prejudice prong because defense counsel was not ineffective when he failed to call a witness to provide cumulative testimony). Further, counsel elicited testimony from Kent that she saw a stained mattress on the floor in the room adjacent to the one that was boarded up. This testimony bolstered his cross-examination of Bitton, who initially testified that she did not tell police about the mattress but later testified that she had taken the mattress out of the residence and burned it, allowing for the jury to infer that she burned a likely blood-stained mattress to destroy evidence.

¶ 158   The jury also heard evidence that multiple individuals had accessed the home while defendant was away. Thus, defendant's assertion that trial counsel was ineffective for failing to elicit testimony from Kent about Bitton's friends, their drug use, and their unsavory characters was cumulative to his own testimony that Bitton was a liar and thief, he was concerned about Bitton

and her friends accessing his home (and having parties or engaging in illegal activities), and he did not want them around.

¶ 159        3. Failure to Present Photographs and to Object to Closing Arguments

¶ 160  Defendant next argues that trial counsel was ineffective for failing to present certain photographs (and to elicit exonerating testimony from defendant concerning the evidence) and failing to object to the State's inflammatory closing arguments.

¶ 161  As to the photographs, defendant asserts that the State argued that the presence of home repair tools and materials showed that defendant was the killer because he sealed the door. Defendant contends that he was constantly involved in home improvement projects and that these pursuits illustrated why such objects were present in his home.  He claims that he asked trial counsel to present photographs of the materials strewn throughout his home, but counsel did not do so.  Defendant argues that the photographs would not have been cumulative to his own testimony and would have had a great impact on the jury by adding "something" to his testimony.

¶ 162  In his affidavit, defendant averred that, prior to trial, he was aware the State would argue that he purchased home remodeling and repair supplies around the time Schaefer was killed.  He asked trial counsel to show the jury photographs of home repair and remodeling supplies present in his garage and strewn throughout the premises, but counsel did not present the photographs and never explained to defendant why he did not introduce them.

¶ 163  We reject defendant's argument.  Defendant did not attach the photographs to his postconviction petition.  See 725 ILCS 5/122-2 (West 2022) (requiring that postconviction petition "have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached.").  Accordingly, his argument is not well pleaded and, thus, fails. See *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006) (at the second stage, all well-pleaded facts

that are not positively rebutted by the record must be taken as true for purposes of the State's motion to dismiss). Further, the photographs would have been cumulative to defendant's testimony, where he testified that he purchased home supplies (including caulk, tools, sandpaper, paint, drill bits, nails, etc.) for years.

¶ 164 Next, defendant argues that counsel failed to object when the prosecutor attacked defendant's credibility by arguing defendant made delusional statements he never made. He takes issue with the prosecutor's argument that defendant had claimed a motorcycle gang or a Mr. Ed murdered Schaefer were laughable and ridiculous. He also contends that the prosecutor ridiculed him for claiming that Schaefer's family had her murdered to collect life insurance money. He asserts he never made those claims and that trial counsel was ineffective in failing to object to those portions of the closing argument.

¶ 165 In his affidavit, defendant averred that, contrary to the prosecutor's closing argument, he never stated that Schaefer's family had her killed to collect life insurance money. He merely relayed what Schaefer had told him about her family having taken out a policy on her, and he testified that he believed the idea of her family killing her was ridiculous.

¶ 166 Defendant's argument could have been raised on appeal, was not, and defendant does not argue in his postconviction petition that appellate counsel was ineffective for failing to raise it. Accordingly, the argument is forfeited. *Id.*

¶ 167 Notwithstanding forfeiture, the argument fails on the merits. "It is well settled that a prosecutor is allowed a great deal of latitude in closing argument [citation] and has the right to comment upon the evidence presented and upon reasonable inferences arising therefrom, even if such inferences are unfavorable to the defendant." *People v. Hudson*, 157 Ill. 2d 401, 441 (1993); *People v. Starks*, 116 Ill. App. 3d 384, 394 (1983) ("It is not improper comment to call the

defendant or a witness a 'liar' if conflicts in evidence make such an assertion a fair inference."). The reference to Mr. Ed was acknowledged as a joke by the prosecutor immediately after it was made. The references to the gang were made at the commencement of the prosecutor's closing argument. Specifically, the prosecutor argued that defendant's testimony was "pure science fiction," a "tall tale," and that "Little green men from Mars did not come down here and get with the Hell's Angels motorcycle gang and Renee Bitton and bury his DNA in this door. That makes absolutely no sense." The comments, arguably "hyperbolic and dramatical rhetorical flourishes" (*People v. Daniel*, 2014 IL App (1st) 121171, ¶ 36), were isolated, and we cannot conclude that they were unduly prejudicial.

¶ 168   In summary, defendant failed to make a substantial showing that trial counsel was ineffective.

¶ 169                                     B. *Brady* Claim

¶ 170   Next, defendant argues that the trial court erred in dismissing his *Brady* claim that the State concealed evidence that Schaefer had enemies and at least one of them had abused her, stalked her, and made multiple threats to kill her.

¶ 171   Under *Brady*, it is a violation of the right to due process for the State to fail to "disclose evidence that is favorable to the accused and 'material either to guilt or to punishment.' " *People v. Harris*, 206 Ill. 2d 293, 311 (2002) (quoting *Brady*, 373 U.S. at 87). Specifically, to establish a claim under *Brady*, the defendant must allege that "(1) the undisclosed evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either willfully or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt or punishment." *People v. Beaman*, 229 Ill. 2d 56, 73-74 (2008).

¶ 172 Defendant argues that the withheld evidence concerning the Missouri police reports relating to Schaefer would have bolstered his testimony, showing that Brier was a real person who had harmed and threatened to kill Schaefer. Trial counsel's failure to use the information (because the State did not disclose it), defendant argues, allowed prosecutors to make the unrebuttable attack during cross-examination of defendant and to present a compelling closing argument that defendant was fabricating nonsensical stories to deflect blame. The State, he further asserts, was able to misrepresent the facts and circumstances surrounding Schaefer's death, making defendant appear to be a vicious desperate person and a guilty liar. Multiple references, he contends, were made to poke fun at his allegedly-ridiculous statements suggesting a gang of drug-dealing thugs could have murdered Schaefer. Had the information been presented to the jury, defendant suggests, the jury would have very likely inferred that Schaefer surrounded herself with people capable of murdering her. At the very least, he continues, disclosure of the information would have shown that defendant had indeed been told these things by Schaefer and was not making up stories.

¶ 173 Defendant also argues that the evidence was not disclosed by the State. He notes that postconviction counsel contacted his first trial counsel, and first trial counsel's office reviewed the file of 600 pages of scanned documents and found no evidence of the reports. Further, trial counsel confirmed the reports were not received. Had the information been disclosed, defendant asserts, trial counsel could have investigated Brier and others to gather additional evidence of those individuals' potential involvement in the murder. However, no investigation took place. McHenry County officials never looked into the allegations, and the Missouri police spoke to Brier but took him at his word. Even without further investigation, defendant suggests, he could have used the evidence to argue that Brier had a motive to harm Schaefer, had threatened to kill her, was involved

in drug distribution, and was associated with unsavory characters capable of criminal acts. The evidence was not too remote or speculative, he urges.

¶ 174  We reject defendant's arguments. Assuming, without deciding, that the documents upon which defendant relies were not disclosed by the State and that they would be admissible,[2] defendant cannot show that they would be exculpatory and/or material to his guilt or that he was prejudiced. The Missouri documents consist of reports relating to a (1) 2002 domestic disturbance involving Schaefer and Brier that did not involve physical contact and resulted in no arrests; (2) 2003 order of protection violation by Brier; (3) 2004 stealing-from-a-vehicle allegation, where Schaefer had stated that she suspected Brier but had no proof; and (4) 2005 miscellaneous online report, wherein Schaefer stated that Brier and her sister conspired to kill her for fraudulent insurance purposes, put a hit on her, and followed her; she had moved to Illinois to get away from stalking/threats on her life; Brier had mentioned human organ theft/selling; and she had reported a meth lab and that her car was stolen. The evidence is too remote in time and speculative to support defendant's claim. The most recent of the documents, the miscellaneous online report, was allegedly made seven years before Schaefer's death in 2012, and there is no indication that charges were filed against Brier. The jury heard evidence of more recent incidents—two 2007 domestic battery charges—involving defendant and Schaefer. Further, the Missouri documents were not materially favorable to defendant or exculpatory, and they cannot be reasonably construed as casting doubt on the verdict. None of the documents support a claim that Brier was in Illinois near the time of Schaefer's death. They also deflect from defendant's claim during trial

---

[2]Defendant did not attach to his petition copies of his open records request documentation, any affidavits, a copy of the State's discovery tendered to defense counsel, etc.

(and in his postconviction petition) that Bitton was responsible for Schaefer's death. Defendant's assertion is speculative and, in light of the overwhelming evidence of his guilt at trial, he cannot show a reasonable probability exists that, had the documents been disclosed, the result of the proceeding would have been different.

¶ 175                                    C. Actual Innocence Claim

¶ 176   Finally, the defendant argues that he made a substantial showing that he is actually innocent of murder and the related charges.

¶ 177   Establishing a claim of actual innocence "is extraordinarily difficult." *People v. Coleman*, 2013 IL 113307, ¶ 94. To succeed on an actual innocence claim, "the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial." *People v. Robinson*, 2020 IL 123849, ¶ 47. "Newly discovered evidence is evidence that was discovered after trial and that the [defendant] could not have discovered earlier through the exercise of due diligence." *Id.* "Evidence is material if it is relevant and probative of the [defendant's] innocence." *Id.* "Noncumulative evidence adds to the information that the fact finder heard at trial." *Id.* "[T]he conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result." *Id.* While this does not mean a defendant is innocent, it does mean that the facts and circumstances of the case should be scrutinized more closely to determine the defendant's guilt or innocence. *Ortiz*, 235 Ill. 2d at 337. This is the most important element of an actual innocence claim. *People v. Harris*, 2024 IL 129753, ¶ 65; *Robinson*, 2020 IL 123849, ¶ 47. To sustain an actual innocence claim, a defendant must satisfy all three elements. *People v. English*, 403 Ill. App. 3d 121, 133 (2010).

¶ 178 Defendant contends that his postconviction petition and supporting documentation made a showing of his actual innocence, including new evidence regarding Brier, the gang and drug operation, Brier's threats to kill Schaefer, his stalking of her, his abuse of her, and more. Because the information and documentation were not disclosed, he asserts, trial counsel could not have been expected to discover it. The evidence is also material and noncumulative, defendant argues, because the jury heard nothing about Brier other than the prosecution's repeated assertions that he did not exist. Further, the jury likely concluded that defendant was fabricating its existence, and, thus, he demonstrated he was prejudiced because the evidence was material to his innocence.

¶ 179 Defendant notes that his theory was that Schaefer was killed after he left Illinois. He testified she had enemies and that Brier had committed criminal acts against her. Defendant asserts that he was prejudiced as a result of the nondisclosure, because he could not credibly identify Brier as a third party who had a motive to kill Schaefer and had intended to do so. He was also prejudiced, he argues, because the nondisclosure resulted in him appearing guilty when he delivered his trial testimony.

¶ 180 We conclude that the trial court did not err in dismissing defendant's actual innocence claim. Defendant failed to make a substantial showing that the evidence was newly discovered, material and not cumulative, or of such a conclusive character that it would probably change the result on retrial.

¶ 181 First, defendant does not show that he did not receive this information from the State or, if he did not receive it, why he could not have discovered the evidence prior to trial, as he clearly knew about many aspects of Schaefer's life in Missouri. Regardless, the evidence was not new because defendant testified extensively about Brier at trial. He maintained at trial that Schaefer had moved to Missouri, and Bitton testified that defendant told her some time before he left that

Schaefer had moved there. In his video interrogation, defendant told detectives that Schaefer had spoken about moving to Missouri and, when he returned from a business trip at one point, in late 2011, she was gone. Defendant also testified that he assumed Schaefer moved to Missouri because she had mentioned doing so numerous times. Defendant testified that he did not know why Schaefer left her identification (Missouri), credit cards, and checkbook in his house if she moved to Missouri. He then addressed Brier, noting that Schaefer had enemies, including a man, "Mark Brier," she used to live with in Missouri and whom she had gotten arrested. Also, she hung out with a motorcycle gang in Missouri and told defendant that they were all involved in drugs and that there was a problem with a "meth" lab there. Defendant further testified that Schaefer had issues with her parents and, although defendant did not believe the story, she told him that people in her family wanted her dead because they had an insurance policy on her. Defendant also told detectives that he had heard (from Bitton and others) that Schaefer was a drug dealer. Thus, the jury heard similar information to that in the Missouri documents.

¶ 182 Second, we conclude that, even if the evidence was new, it was not material and noncumulative because, as we discussed above, it was remote, and defendant testified to much of the same information.

¶ 183 Finally, we conclude that, even assuming the evidence was new and material, it was not of such a conclusive character that it would probably change the result on retrial. We concluded on direct appeal that the evidence of defendant's guilt of first degree murder, even excluding the firearms evidence, was overwhelming, and it bears quoting here at length from our analysis of the sufficiency issue:

> "It is undisputed that Schaefer lived with defendant and that, several years before her death, defendant pleaded guilty to battery of Schaefer. Haskell testified that Schaefer

was killed between October 2011 and June 2012. Bitton and Pribek testified that they last saw Schaefer around January 2011. Jones testified that there was "a lengthy period" during which defendant still occupied the house and Schaefer was no longer present. Defendant left on his cross-country trip on June 15, 2012.

Defendant's testimony that Schaefer might have moved to Missouri was belied by the evidence of items that belonged to Schaefer found in her bedroom. The evidence included her checkbook (with the last recorded entry dated September 28, 2011), day planner (with the last entry dated September 29, 2011), credit cards, purse, mail, and identification. Defendant had no plausible explanation for why Schaefer would have left behind necessary personal items. Defendant merely (and wildly) speculated that Schaefer had enemies and might have been a drug dealer.

Defendant's actions before he left on his trip were highly unusual, and his actions afterward were highly suspicious. Before he left (and after Schaefer had not been seen for months), defendant secured his residence by screwing shut the windows and doors. Defendant denied sealing Schaefer's bedroom and could offer no explanation for the presence of his DNA on a piece of latex glove found on duct tape on the doorframe, other than speculation that it was his enemies' attempt to frame him for murder. He testified that he took the security measures to protect his belongings and because he did not trust Bitton, whom he had actually hired as the property's caretaker. He also spoke to her almost daily after he left and repeatedly instructed her not to enter the residence. However, defendant's actions after his residence sustained water damage completely undermined his claim that he took the highly unusual measures to protect his home. When pipes burst and water was running down the walls, defendant continued to instruct Bitton not to enter the residence.

The only reasonable inference from this evidence is that defendant was not concerned about his valuables or damage to his property but was hiding something in the home. Indeed, on November 6, 2013, Schaefer's skeletal remains were found in her bedroom.

\* \* \*

\*\*\* The evidence showed that no one saw Schaefer for a while before defendant left on his trip and that defendant exercised unusually restrictive control over his home, where Schaefer's remains were located. This, along with the other evidence noted above, was more than sufficient to tie him to the murder." *Ross*, 2018 IL App (2d) 161078, ¶¶ 194-98.

¶ 184 The evidence concerning Brier and Schaefer's life in Missouri was not of such a conclusive character that it would probably change the result on retrial, in light of: (1) the evidence concerning defendant's unusual actions before Schaefer's murder (sealing the home and Schaefer's bedroom) and after her murder (insisting to Bitton not to enter the home, even after it sustained water damage); (2) the fact that she was not seen by anyone before defendant left Illinois; (3) the fact that he pleaded guilty to battery of Schaefer several years before her death; and (4) certain personal items were found in her bedroom in defendant's home (including a checkbook with the last recorded entry dated September 28, 2011, a day planner with the last entry dated September 29, 2011, and other items).

¶ 185 The Missouri documents do not contain "far more exculpatory details," as defendant argues, and, as to the most potentially serious of the documents, they do not suggest that any charges were ever filed against Brier concerning the alleged conspiracy by him and Schaefer's sister to kill Schaefer or her allegations about the insurance policy on her life. Thus, defendant's assertion that, by their nature, the police reports would have bolstered his testimony concerning

Brier and Schaefer's life in Missouri, which essentially was cumulative to these allegations, is not well taken. Further, as we noted above, at trial and in his postconviction petition, he pointed to Bitton as the killer. Thus, it is unclear how the Missouri documents could have been viewed by the jury as exonerating, rather than as another deflection from the very strong evidence of defendant's guilt.

¶ 186 In summary, defendant failed to make a substantial showing of actual innocence.

¶ 187                                    III. CONCLUSION

¶ 188 For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 189 Affirmed.